IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PRISCILLA HUSTON,          :
                           :          Case No. 4:05-CV-2389
          Plaintiff        :
                           :
     v.                    :          (Judge McClure)
                           :
THE PROCTOR & GAMBLE       :
PAPER PRODUCTS COMPANY,    :
                           :
          Defendant.       :

## MEMORANDUM

May 24, 2007

## BACKGROUND:

Before the court is defendant's summary judgment motion requesting we dismiss plaintiff's complaint in its entirety.  Plaintiff's complaint asserts claims of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and under the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq. ("PHRA").  Specifically, plaintiff contends she was exposed to a sexually hostile and offensive work environment while working for the defendant, and that her employment was ultimately terminated because she complained about such an environment.  Defendant asserts that it is not liable for any alleged sexually hostile work environment because it launched an immediate

1

investigation and took adequate remedial action after plaintiff made her complaint to management personnel.  Defendant also contends there is no evidence that plaintiff's firing was done in retaliation for her complaint of sexual harassment.

On November 30, 2006, defendant filed its motion for summary judgment, which is now ripe for decision.  For the following reasons, we will grant defendant's motion.

**DISCUSSION:**

## I.  Standard of Review

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit.  Id.; Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the

evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party. Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, (3d Cir. 1995). The nonmoving party, however, cannot defeat a motion for summary judgment by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that demonstrates that there is a genuine issue as to a material fact. See Celotex, 477 U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## II.  Statement of Facts

Plaintiff began working for the defendant in 1990 as a Technician at defendant's Mehoopany plant. The Mehoopany plant manufactures various paper products and diapers. Plaintiff primarily worked on one of the several paper machines at the plant as a member of one of the four teams assigned to the

machine.  The teams, entitled A through D, each covered a different shift, but primarily worked on the same machine.  Plaintiff worked on different shifts with different teams throughout her tenure.  After suffering a back injury, plaintiff was transferred from the A-team to the C-team in May 2004.  Her supervisor was Francisco Lanza.

Shortly after being placed with the C-team, plaintiff was exposed to inappropriate conversations and behavior.  On May 13, 2004, a fellow team member, Scott Pousen, informed plaintiff that another team member, Justin Adams, had put his testicles on the testing table to "cool them off."  (Def.'s Statement of Facts, Doc. Rec. No. 21-1, ¶ 9.)  Plaintiff claims that team members Scott Pousen, Bob Allabaugh, and Eric Lybolt witnessed Adams' inappropriate behavior.  (Pl.'s Statement of Facts, Doc. Rec. No. 27, ¶ 9.) She also claims that on May 14, 2004, Pousen informed Pete Romanchick - a "process coach" - and Jack Traver - a "machine leader" - about Adams' actions.  (Id. at ¶ 10.)  Later that month on May 22, 2004, Pousen and Adams informed the plaintiff that another employee, Drew Kline, had also cooled off his testicles in front of Pousen, Allabaugh, Lybolt, and Adams.  The next incident occurred on June 7, 2004, and involved Bob Allabaugh exposing his testicles to plaintiff and commenting that he had shaved them the night before.  Plaintiff claims Pousen and Adams were present

during Allabaugh's indiscretion.  (<u>Id</u>. at ¶ 11.)  The next day, June 8, 2004,

Allabaugh once again exposed his genitals to the plaintiff, this time while Adams

and a temporary employee, Eric Lybolt, were present.  Plaintiff admits that all of

the employees that performed or witnessed these incidents - Pousen, Allabaugh,

Adams and Lybolt - were non-supervisory employees.  Plaintiff does claim,

however, that Romanchick and Traver - the two employees who were informed of

Adams' May 13th inappropriate behavior - qualify as supervisory employees

because of their respective "process coach" and "machine leader" titles.  (Id. at ¶¶

10, 12.)

Shortly after being removed from the C-team because of a physical injury,

plaintiff reported the above incidents to the defendant through a senior-level paper

manager named Regina Gray, and to a human resources manager named Linda

Sheehan.  In addition to the incidents described above, plaintiff reported that

Pousen, Allabaugh, and Adams were looking at pornography on the computer, that

Adams brought dirty books into work and kept them at work, and that Adams had

asked a couple of temporary female employees about giving "blow jobs."  (Def.'s

Statement of Facts, Doc. Rec. No. 21-1, ¶ 19.)  Plaintiff reported all of this to Gray

and Sheehan on June 30, 2004, and on that same day defendant launched an

investigation into plaintiff's allegations.  Defendant's investigation included

5

interviews with Pousen, Allabaugh, Adams, Traver, and Lybolt, but according to plaintiff did not include interviews with Romanchick or Kline. Plaintiff also asserts that the team leader, Kim Goodshall, was not interviewed. All of the witnesses interviewed denied witnessing or engaging in any incidents of indecent exposure. Adams did admit, however, that he made sexually explicit remarks to the two temporary employees.

After completing the investigation, the defendant found that all of the team members, including the plaintiff, were guilty of using inappropriate language. The defendant further found that Adams had inappropriately made sexually explicit remarks to two temporary female employees, and that Allabaugh had sent to several fellow employees an email that included pictures of women's breasts. As a result of this investigation, Allabaugh was disciplined by being placed on Step IV discipline (which is one step away from termination).[1] He was also required to develop a written improvement plan, and required to give a seminar to various teams of employees on sexual harassment.[2] Several employees who received the

---

[1] The defendant utilizes a "Performance Modification policy under which employees are given disciplinary actions under a progressive discipline process which goes from Step 1 through Step V, which is termination of employment." (Def.'s Statement of Facts, Doc. Rec. No. 21-1, ¶ 31.)

[2] Plaintiff asserts that Allabaugh never actually gave the presentation. See (Pl.'s Statement of Facts, Doc. Rec. No. 27, ¶ 24 (repeat).) Defendant alleges, and

inappropriate email but did not report it were given warnings.[3]  Finally, all

members of the team, including plaintiff, were given warnings because defendant

found all had used inappropriate language.

After the investigation, plaintiff alleges that her friendly co-workers began

avoiding her, and that she experienced one other incident that could be rightly

considered "hostile."  In September 2004, another employee not part of the C-

team, Rich Spencer, flipped his middle finger in plaintiff's face while she was

assigned by the defendant to take Spencer's picture.  He also extended his fingers

over his head in an attempt to mimic horns.  Traver, who was present during this

incident and who plaintiff claims is a friend of Spencer's, observed Spencer's

actions but looked away.

Since the start of the investigation and throughout the summer of 2004,

plaintiff was prevented from working on any of the paper machines because of a

physical injury.  In September, she was taken off restrictions and placed on the D-

team to resume work on a paper machine.  Her work included checking the

---

plaintiff admits, that the defendant has a policy against sexual harassment and that
it gives all its workers training on the subject, including members of plaintiff's
work teams.  Compare (Def.'s Statement of Facts, Doc. Rec. No. 21-1, ¶¶ 29-30),
with (Pl.'s Statement of Facts, Doc. Rec. No. 27, ¶¶ 29-30.)

[3] Plaintiff asserts that not all the recipients of the email were given warnings.
See (Pl.'s Statement of Facts, Doc. Rec. No. 27, ¶ 25.)

instruments and gauges on the paper machine at the beginning of a shift, writing

down the readings on a log form, and then entering those values into the computer

system.

On October 21, 2004, plaintiff was responsible for preparing the machine

area log for her shift.  The technician responsible for ensuring that everything ran

smoothly was Pete Romanchick, the "process coach."  After noticing that plaintiff

took an unusually short amount of time to prepare the machine area log,

Romanchick became suspicious that plaintiff was "pencil whipping," or making

up, the machine log entries.  (Def.'s Statement of Facts, ¶ 44.)  He ordered another

technician, Doug Walker, to actually read the instruments and compare the

readings to the ones recorded by plaintiff onto the machine area log.  (Id. at ¶ 45.)

Walker and Romanchick noted that there were discrepancies that suggested

plaintiff had not actually walked around the machine, but instead simply copied

some of the data from the earlier shift.  In addition, Romanchick found that some

of the numbers in the handwritten machine area log were different than the

numbers in the computer.  Romanchick passed this along to plaintiff's supervisor,

Francisco Lanza.  When confronted, plaintiff admitted to copying numbers from

the previous shift.  Before this incident, plaintiff and other technicians had been

told in a meeting that falsification of quality data would not be tolerated and that it

would be grounds for termination of employment.  Plaintiff, who at the time of the

October 21st incident was herself on Step IV discipline, was terminated.  Plaintiff

complained at the time that everyone else had falsified the machine area logs and

that she was being unfairly targeted.  The defendant suggests that it did investigate

plaintiff's claim, but found no evidence that others had falsified the machine area

logs.  (Def.'s Statement of Facts, Rec. Doc. No. 21-1, ¶ 52.)  Plaintiff, however,

disputes that such an investigation ever took place.  (Pl.'s Statement of Facts, Rec.

Doc. No. 27, ¶ 52.)

### III.  Plaintiff's Hostile Work Environment Claim

Plaintiff alleges she was subjected to sexual harassment that created a hostile

work environment in violation of Title VII and PHRA.[4]  To succeed in making

such a claim, plaintiff must establish five elements:

> (1) the employee suffered intentional discrimination
> because of her sex; (2) the discrimination was pervasive
> and regular; (3) the discrimination detrimentally affected
> the plaintiff; (4) the discrimination would detrimentally
> affect a reasonable person of the same sex in that

---

[4]  We note that PHRA claims are interpreted coextensively with Title VII
claims.  Douris v. Genaurdi's Family Markets, Inc., 132 Fed. Appx. 425, 425 n.1
(3d Cir. 2005) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996));
Dennison v. Pennsylvania Dept. Of Corrections, 268 F. Supp. 2d. 387, 405 n. 16
(M.D. Pa. 2003.) (Munley, J.).  Therefore, our analysis of both plaintiff's hostile
work environment and retaliation claims under Title VII will apply with equal
force to the claims plaintiff asserts under PHRA.

position; and (5) the existence of respondeat superior
liability.

Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (citing Andrews

v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).  For purposes of this

motion, defendant challenges only plaintiff's ability to meet the fifth element,

arguing that plaintiff's evidence fails to establish a genuine issue of material fact

that respondeat superior liability exists for defendant.[5]

When the source of the alleged harassment is co-workers and not a

supervisor, as it is in this matter, to meet the fifth element "the plaintiff must

demonstrate that the employer failed to provide a reasonable avenue for complaint,

or, if the employer was aware of the alleged harassment, that it failed to take

appropriate remedial action."  Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir.

2001) (citing Kunin, 175 F.3d at 293).  An employer is considered aware of the

harassment if the plaintiff proves that "management-level employees had actual or

constructive knowledge about the existence of a sexually hostile environment."

Andrews, 895 F.2d at 1486.  To establish constructive notice, the plaintiff can

---

[5] We recognize that the Third Circuit has noted the term "respondeat superior" in this context may be a misnomer because an employer's liability for co-worker sexual harassment is direct, not vicarious.  See Kunin, 175 F.3d at 293 n. 5 (citing Williamson v. City of Houston, 148 F.3d 462, 465 (5th Cir. 1998)).  Because we are applying the correct legal standards to the arguments made by both parties in this matter, this observation has no effect on our analysis.

either prove (1) management-level employees were provided with enough information to "raise a probability of sexual harassment in the mind of a reasonable employer," or (2) "the harassment is so pervasive and open that a reasonable employer would have had to be aware of it."  Kunin, 175 F.3d at 294.

The parties disagree on both when the defendant received notice of the sexual harassment, and whether the defendant employed prompt and adequate remedial action after receiving such notice.[6]  Defendant contends that it received notice when plaintiff first complained to senior-level paper manager Regina Gray and to human resources manager Linda Sheehan on June 30, 2004.  Defendant also asserts that on that same day it initiated its investigation, and that the investigation, and the subsequent findings and disciplinary action constitute prompt and adequate remedial action that protects defendant from respondeat superior liability.  Plaintiff disagrees, and argues that defendant received constructive notice of the sexual harassment when "process coach" Pete Romanchick and "machine leader" Jack Traver were informed on May 14th about Adams' sexually inappropriate actions.  Plaintiff also argues that defendant's eventual investigation and remedial action

---

[6] Plaintiff does not contend that defendant failed to provide its employees a reasonable avenue to make complaints about sexual harassment, nor does plaintiff contend that the harassment at the Mehoopany plant was so pervasive that defendant should have been aware of it.  Therefore, we will not address these two potential arguments.

were inadequate.  To resolve these arguments, we must determine (1) whether

Romanchick and Traver were management-level employees sufficient to impute

their knowledge of any sexual harassment to the defendant,[7] and (2) whether

defendant engaged in prompt and adequate remedial action.

### A.  Management-level Employees

As we have reiterated in the past, "'a supervisor's knowledge generally will

be imputed to the company for purposes of liability only if the supervisor is at a

sufficiently high level in the company hierarchy.'"  Anderson v. Deluxe Homes of

PA, Inc., 131 F. Supp. 2d 637, 651 (M.D. Pa. 2001) (quoting Bishop v. Nat'l

Railroad Passenger Corp., 66 F. Supp. 2d 650, 667 (E.D. Pa. 1999)).  The Third

Circuit requires the supervisor to be a "management-level" employee, see Kunin,

175 F.3d at 294, but it has given little guidance as to what that term exactly means

in the context of imputing constructive notice of co-worker sexual harassment to

---

[7] We note that it is not clear from the record exactly what Romanchick and Traver knew about Adams' sexually inappropriate actions.  Plaintiff contends that they were told about Adams' actions on May 14th, but it is not clear whether Romanchick and Traver were also told that plaintiff was made aware of Adams' inappropriate behavior.  Without knowing that plaintiff was made aware of Adams' sexually inappropriate conduct, one may argue that Romanchick and Traver did not know that the plaintiff was subjected to sexual harassment, which would mean there can be no constructive knowledge of harassment imputed to defendant.  Nevertheless, because we ultimately find that Romanchick and Traver are not management-level employees, their knowledge of any sexual harassment is irrelevant.

the employer.  When facing this dilemma before, we turned to agency law, and found that "an employer will be charged with knowledge when (1) the official is at a sufficiently high level in the company to qualify as a "proxy" for the company; (2) the official has a duty to act on his or her knowledge and put a stop to the harassment; or (3) the official is charged with a duty to inform the employer of the harassment."  <u>Anderson</u>, 131 F. Supp. 2d at 652 (citing <u>Torres v. Pisano</u>, 116 F.3d 625, 636 (2d Cir. 1997) (citing Restatement (Second) Agency § 275)).[8]  Another court's ruling in this Circuit has interpreted the Third Circuit's "management-level" reference to apply only to those employees who have "the power to set work schedules, rate of pay or assignments, or take part in an employee's hiring or firing."  <u>Dunlap v. Boeing Helicopter Div.</u>, No. 03-CV-2111, 2005 U.S. Dist. LEXIS 2781, at *21 (E.D. Pa. Feb. 23, 2005).  According to <u>Dunlap</u>, senior employees who have the authority to direct the work of junior employees but do

---

[8] Because of the particular facts in <u>Anderson</u>, we relied on apparent authority and found that a genuine issue of material fact existed as to whether the individual in question was a management-level employee.  <u>Anderson</u>, 131 F. Supp. 2d at 653. There, the plaintiff had actually told the individual in question that she was being harassed, and had testified in a deposition that she thought the individual was her supervisor, thereby raising the issue of apparent authority.  <u>Id</u>. at 652-53. Here, the plaintiff has neither raised the issue nor brought forth evidence that Romanchick and Traver had apparent authority sufficient to qualify them as management-level employees, and therefore we will not consider the principles relating to apparent agency authority.

not possess the powers quoted above do not fall within the definition of a "management-level" employee.  <u>Id</u>. at *20-21.

We find that our previous definition, combined with <u>Dunlap</u>'s definition, sufficiently captures the Third Circuit's meaning of "management-level" employees.  Both definitions focus on duties that reflect a management-like authority over the employment of the employees, and not merely authority over the actual work conducted by the employees.  Plaintiff urges us to accept an expanded definition of supervisor that would include employees who merely have control over the daily work activities of other employees.  <u>See</u>, <u>e.g.</u>, <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 127 (2d Cir. 2003) (finding that a harassing employee who had authority over the daily work assignments of other employees was a supervisor).  We find, however, that such a definition would create too low of a threshold, and does not properly reflect the level of hierarchy necessary to impute liability.  To be considered sufficiently high in an employer's hierarchy to impute liability to the employer - and thus be considered "management-level" - an employee should have some significant authority over the employment status of other employees.  Our previous definition and <u>Dunlap</u>'s definition sufficiently captures the kind of significant authority over employment status we find necessary to impute liability.  To hold otherwise and accept plaintiff's definition would mean that potentially

14

someone who is at the bottom rung of a company's hierarchy but had authority over the daily work activities of others could be considered a supervisor for these purposes, which would not adequately reflect the Third Circuit's reliance on "management-level."      With these definitions in mind, we turn to the nature of Romanchick and Traver's leadership positions and whether they can be considered "management-level."  According to Linda Sheehan, defendant's Employee Relations Manager, defendant employs two categories of employees - Technicians and Managers.  See (Decl. of Sheehan, Doc. Rec. No. 28-2, ¶ 2.)  Managers are salaried employees, "who have the authority to hire, discipline and discharge other Technician employees," while Technicians are hourly paid employees "who do not have the authority to hire, discipline and discharge other Technician employees." (Id.)  According to Sheehan, Technicians who have reached a certain skill level are given responsibility over the manufacturing process, but "they do not have the authority of managers." (Id.)  Technicians rotate through these lead positions.  (Id.) In fact, at one point the plaintiff held a leadership position.  See (Huston Dep., Rec. Doc. No. 26-31, p. 62-63.)  Sheehan states that Romanchick and Traver were and still are Technicians who have never had management authority. See (Decl. of Sheehan, Doc. Rec. No. 28-2, ¶ 3.)

This testimony establishes that Romanchick and Traver, as "process coach"

and "machine leader," were not sufficiently high enough on defendant's hierarchy to be considered "management-level."  Unlike Managers, they have no authority over the employment status of other Technicians, such as the firing, hiring, or raising or lowering of salaries of their fellow Technicians.  Indeed, the fact that fellow Technicians of similar expertise as Romanchick and Traver, which includes plaintiff, have rotated through similar leadership positions suggests that Romanchick, Traver, and the plaintiff are all on the same level of hierarchy at the company, a level which is below the level necessary to impute liability.[9]  Further, the leadership roles Traver and Romanchick held do not appear to include a duty to inform the defendant of any alleged harassment, and it does not appear the position afforded Romanchick or Traver the authority to stop any harassment.  The authority they did have over other Technicians stemmed solely from their authority over the manufacturing process, and nothing more.

Plaintiff disagrees, and argues that Romanchick and Traver had the authority to confront Adams and the other Technicians about their behavior.  Although plaintiff testifies in general terms that Romanchick and Traver had the authority to

---

[9] If we were to use plaintiff's definition of "management-level," then those at the bottom rung of the hierarchy at the Mehoopany plant - Technician - could be considered supervisors of other Technicians simply because they are temporarily in charge of the daily work activities.  As we discuss above, such a result would undermine the Third Circuit's emphasis on the term "management-level."

"enforce the team members' responsibilities across the board," her specific

description of their duties is limited to control over the manufacturing process.  <u>See</u>

(Huston Aff., Rec. Doc. No. 26-3, ¶ 27.)  For instance, plaintiff states that the

"duties of a Process Coach include checking the numbers imputed by team

members," and that if he saw any discrepancies he had the duty to report the

problem to the Department Manager.  (<u>Id</u>.)  The duties of Machine Leader included

directing team members regarding problems with the machines, and what work had

to be done that day.  (<u>Id</u>.)  Nowhere does plaintiff testify that they had an

affirmative duty to report sexual harassment, stop sexual harassment, or have any

authority over the other team members outside of controlling their daily work

activities.  Therefore, when plaintiff refers to Romanchick and Traver as having

authority to enforce the other team members' responsibilities "across the board,"

the only inference possible is that they have authority over all of the

responsibilities that relate to the manufacturing process.  Without more evidence

that Romanchick and Traver are high enough on the defendant's hierarchy to

qualify as "management-level" employees, plaintiff has failed to raise a genuine

issue of material fact that Romanchick and Traver were supervisors such that their

knowledge of any alleged sexual harassment can be imputed to the defendant.

<u>B.  Prompt and Adequate Remedial Action</u>

17

Because we find that Romanchick and Traver are not "management-level" employees, this means that defendant was first put on notice of the alleged sexual harassment when plaintiff complained to Sheehan and Gray on June 30, 2004. Defendant argues that it responded immediately to plaintiff's complaint, launching an investigation that very same day.  Defendant further argues that the subsequent remedial action it took was adequate, in large part because the inappropriate sexual conduct ceased.  Plaintiff disagrees, and argues that defendant's investigation and subsequent remedial action was not adequate because the few perpetrators defendant did punish were punished for only the most minor of infractions, the punishment meted out was insufficient, and that plaintiff was wrongly punished. Plaintiff does not, however, challenge defendant's claim that the sexual harassment did in fact cease after the defendant responded to plaintiff's complaint, nor does plaintiff challenge defendant's assertion that it reacted promptly after plaintiff made her complaint.[10]

To determine whether an employer's response to allegations of sexual

---

[10] Although plaintiff does allege she experienced hostile treatment from Rich Spencer while taking his photo and that generally her friends stopped talking to her, she does not allege that she experienced any more sexual harassment subsequent to defendant's taking remedial action.  In fact, she specifically testified that the sexual harassment stopped once she made her complaint to Sheehan and Gray.  See (Huston Dep., Doc. Rec. No. 26-32, p. 138.)

harassment amounts to prompt and adequate remedial action sufficient to shield the employer from liability, a court must determine whether the remedial action was "reasonably calculated to prevent further harassment." Knabe v. The Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997). Although the law requires an investigation, see id. at 414, the law does not require that the investigation be adequate. Id. If the investigation is lacking, an employer still escapes liability unless the remedial action is also found lacking. Id. Of course, if the employer's investigation is so flawed that it prevents the discovery of serious and significant harassment by an employee, then the remedy chosen may not be held reasonable to prevent further harassment. Id. Third Circuit precedent, however, provides that "when the employer's response stops harassment, there cannot be Title VII liability." Kunin, 175 F.3d at 294 (citing Bouton v. BMW of N. America, Inc., 29 F.3d 103, 110 (3d Cir. 1994)).

We find defendant's response amounted to adequate remedial action. After initiating an immediate investigation once receiving plaintiff's complaint, the defendant interviewed all of the parties who had either allegedly informed plaintiff of the sexual misconduct, or allegedly engaged in such misconduct in front of plaintiff. This included Pousen, Allabaugh, and Adams. In addition, defendant interviewed Lyobolt and Traver. After interviewing these individuals, defendant

found that all parties, including plaintiff, used vulgar language and that Allabaugh

had sent an indecent email to others.  He was disciplined, at least some of the

individuals receiving the emails were given warnings, and all the parties were

warned for using inappropriate language.  As a result of this investigation and

remedial action, plaintiff no longer suffered any sexual harassment.  Further,

plaintiff was never assigned back to C-team after she was able to resume work.

These facts establish that the defendant commenced an immediate investigation,

the results of which led to adequate remedial action that ultimately stopped the

harassment.

Plaintiff first challenges the adequacy of the investigation.  She argues that

the defendant's failure to interview Romanchick and Kline, its failure to review the

contents of the computer that allegedly was used to view pornography, and

Sheehan's sloppy records raise genuine issues of material fact as to whether the

plaintiff's investigation was adequate enough to render defendant's remedial action

effective.  We disagree.  None of these arguments suggests that the investigation

was so flawed that it failed to discover serious and significant harassment.

Romanchick and Kline were both later deposed and neither provided information

that would have proved helpful to plaintiff had defendant interviewed them during

its investigation.  Reviewing the contents of the computer for pornography, even if

20

feasible, would not have revealed a significant finding that plaintiff was being sexually harassed.  Finally, plaintiff has failed to establish how Sheehan's allegedly sloppy records had any discernible impact on the adequacy of the investigation. Although the investigation may not have been perfect, it was not so deficient as to render defendant's remedial action inadequate.

Plaintiff also attacks the adequacy of the discipline taken, an attack which we find meritless.  Plaintiff complains that the defendant impermissibly believed the witnesses' version of the situation, including allegations that plaintiff had also used vulgar language.  Plaintiff also argues that the discipline that was eventually meted out was insufficient because it only amounted to warnings for some of the accused, and included Step IV discipline for only one of the accused, Bob Allabaugh.  Plaintiff contends that having Allabaugh do subsequent sexual harassment trainings was "unconscionable," and that it was unfair to have her punished too.  Plaintiff is not entitled, however, to have the defendant believe her version simply because she filed a complaint.  See Knabe, 114 F.3d at 413 n.11 ("[A]n employer need not credit a complaint simply because an employee makes it.").  Nor is she entitled to have the defendant take the specific remedial action she wants.  See id. at 414 ("[A]n employee cannot dictate that the employer select a certain remedial action.").  Given the promptness and relative adequacy of the

investigation, combined most importantly with the fact that she did not suffer

further harassment and was not reassigned to the C-team, any deficiency that may

exist in defendant's decision to believe the witnesses over plaintiff or in the

discipline handed out does not raise genuine issues of material fact.  We find that

defendant employed prompt and adequate remedial action, thus preventing plaintiff

as a matter of law from showing respondeat superior liability exists in this matter.

For these reasons, we will dismiss plaintiff's hostile work environment claim made

under both Title VII and the PHRA.

### IV.  Plaintiff's Retaliation Claim

Plaintiff claims she was fired because she complained of sexual harassment.

Retaliation claims under Title VII proceed in the familiar three stages set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36

L. Ed. 2d 668 (1973).  First, the plaintiff must provide sufficient evidence to

establish a primae facie case of discrimination.  Jones v. Sch. Dist. of Philadelphia,

198 F.3d 403, 410 (3d Cir. 1999).  Second, if plaintiff succeeds in doing so, the

burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory

reason for the employee's rejection.'"  Id. (citing McDonnell Douglas Corp., 411

U.S. at 802).  Finally, if the defendant carries this burden, then the plaintiff must

prove by a preponderance of the evidence that the legitimate reasons offered by the

defendant are not true but rather act as mere pretext for the discrimination.  Id.

(citation omitted).

To establish a prima facie case, the plaintiff must demonstrate that: (1) she

engaged in protected activity; (2) the employer took adverse employment action

against her; and (3) there was a causal connection between the protected activity

and the adverse employment action.  See Weston, 251 F.3d at 430 (citations

omitted).  Defendant only challenges plaintiff's ability to establish a causal link

between the protected activity - complaining about sexual harassment - and the

adverse employment action - her termination.  To establish such a causal link, the

plaintiff can rely solely on evidence of temporal proximity between the filing of

the complaint and the adverse employment action taken against her as long as such

evidence is "unusually suggestive of retaliatory motive."  Shellenberger v. Summit

Bancorp, Inc., 318 F.3d 183, 189 n. 9 (3d Cir. 2003) (citations omitted).  In

addition to temporal proximity, plaintiff may also rely on evidence of ongoing

antagonism, evidence of other retaliatory acts, or other evidence from the record

that can infer causation.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281

(3d Cir. 2000).

The three and one-half months that passed between her complaint to

defendant and termination of her employment is not unusually suggestive to infer,

by itself, retaliatory motive, and as a result we find it to be inconclusive to establish causation. The only evidence plaintiff has of antagonism or of retaliatory acts is that some of her friends have distanced themselves from her, and that another employee - Rich Spencer - gave her the "devil horns" and the finger when she took his picture. Defendant is not responsible for the actions of plaintiff's former friends, and Spencer's actions do not qualify as the kind of antagonism that would suggest plaintiff's firing was retaliatory.

Plaintiff suggests that firing her for "pencil whipping"- i.e. making up the machine area log entries - is evidence of retaliation because defendant knew her male co-workers were guilty of the same misconduct but chose not to punish them in a similar manner. We do not find evidence in the record to support plaintiff's contention. Shortly before plaintiff's termination,[11] defendant had a meeting with the plaintiff and other Technicians and informed them that falsification of quality data would not be tolerated and that it may result in termination. At the time of her termination plaintiff was on Step IV discipline, which was one step away from termination. She admits that on October 21, 2004 she did in fact falsify data on the machine area logs. For this reason, her manager - Francisco Lanza - and

---

[11] The parties disagree on when exactly this meeting took place, but agree it happened prior to plaintiff's termination. For our purposes, it matters only that the meeting happened prior to plaintiff's termination, and that plaintiff was present.

defendant's management terminated her employment.  Plaintiff offers prior machine area logs that appear to have the same entries for different shifts as evidence that her co-workers were guilty of similar "pencil whipping."  Even if these logs alone were sufficient to establish that others were guilty of falsifying the log entries, these logs do not establish that anyone in management actually knew of such falsification, let alone knew that such falsification was intentional.

Plaintiff also asserts she saw other co-workers engage in "pencil whipping," and that Lanza did nothing when she informed him that others engaged in similar misconduct.  First, we note that the only evidence she offers to support this claim is the deposition of fellow co-worker Douglas Walker who testified that he did not know whether Lanza investigated plaintiff's claims.  See (Walker Dep., Rec. Doc. No. 26-14, p. 19-20.)  This alone is not sufficient to establish a genuine issue of material fact as to whether or not Lanza investigated plaintiff's claims.  In fact, Lanza testified that he did check the logs upon hearing plaintiff's claims.  See (Lanza Dep., Rec. Doc. No. 26-18, p. 67.)  Second, even if plaintiff had presented sufficient evidence to establish Lanza did not investigate her claims, Lanza's decision not to believe plaintiff's accusations would not amount to evidence of a prima facie case of retaliation either standing on its own, or combined with the other evidence in the record.  Without sufficient evidence that establishes Lanza

25

and defendant's management knew of other similarly situated co-workers intentionally falsifying log entries, plaintiff cannot establish that those who made the decision to terminate her employment intentionally singled her out for misconduct that was engaged in by others.[12]

With inconclusive temporal proximity, insufficient evidence of antagonism, and insufficient evidence of undue favoritism, plaintiff has failed to establish a prima facie case of causation between her sexual harassment complaint and termination of her employment. Even viewing this evidence as a whole, as we are required to do, plaintiff's claim fails. She was properly fired for falsifying data, and there is no evidence that presents a genuine issue of material fact that such a firing was motivated by plaintiff's sexual harassment complaint made months before her firing. For these reasons, her retaliation claims fail.[13]

---

[12] We also note plaintiff's unsupported accusation that such "pencil-whipping" continues, even if admissible, does not help show causation.

[13] Even if we were to find that plaintiff established a prima facie case of causation, we still would find her retaliation claim wanting. The second stage in the McDonnell Douglas Corp. burden shifting is for the defendant to articulate a legitimate, non-discriminatory for plaintiff's firing, which in this case clearly would be plaintiff's intentional falsification of log entries after being warned that doing so may result in termination. The next stage requires plaintiff to offer evidence that such a reason acts as mere pretext for the real reason, which is discriminatory. Here, the only argument that plaintiff presents is that defendant failed to fire those similarly situated co-workers who engaged in the same misconduct that led to her firing. For the reasons stated above, plaintiff's evidence

**CONCLUSION:**

For the aforementioned reasons, the court will issue an accompanying order

entering judgment in favor of defendant Proctor & Gamble Paper Products

Company and against plaintiff Priscilla Huston.


    s/ James F. McClure, Jr.    
James F. McClure, Jr.
United States District Judge

---

supporting this claim is insufficient, and thus plaintiff also fails in rebutting
defendant's legitimate, nondiscriminatory reason for her firing.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PRISCILLA HUSTON,                   :
                                    :        Case No. 4:05-CV-2389
            Plaintiff               :
                                    :
v.                                  :        (Judge McClure)
                                    :
THE PROCTOR & GAMBLE                :
PAPER PRODUCTS COMPANY,             :
                                    :
            Defendant.              :

**O R D E R**

May 24, 2007

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendant's motion for summary judgment is granted.  (Rec. Doc.

No. 20.)

2.    Final judgment is entered in favor of defendant Proctor & Gamble

Paper Products Company, and against plaintiff Priscilla Huston.

3.    The clerk is directed to close the case file.


      ___s/ James F. McClure, Jr.____
      James F. McClure, Jr.
      United States District Judge

1